In re HOTEL ASSOCIATES
OF TUCSON, Debtor.

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY,
Appellant,

v.

HOTEL ASSOCIATES OF TUCSON,
et al., Appellees.

BAP No. AZ–92–2282–MeRV.
Bankruptcy No. 92–0620–TUC–LO.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted Sept. 23, 1993.

Decided March 31, 1994.

Scott D. Gibson, Tucson, AZ, for Connecticut General Life Ins.

John R. Clemency, Phoenix, AZ, for Hotel Associates of Tucson.

Before: MEYERS, RUSSELL and VOLINN, Bankruptcy Judges.

## OPINION

MEYERS, Bankruptcy Judge:

### I

Connecticut General Life Insurance Company ("Connecticut General") appeals from the orders confirming the First Amended Plan of Reorganization submitted by the Paragon Group (the "Paragon Plan") and denying confirmation of the competing Plan of Reorganization filed by C.R.H.C. of Tucson, Inc. (the "CRHC Plan").

### II

### FACTS

Hotel Associates of Tucson ("the Debtor") filed a voluntary Chapter 11 petition on February 28, 1992. The Debtor is an Arizona limited partnership whose sole asset is a 204-room hotel (the "Hotel") in Tucson, Arizona. The general partners of the Debtor are Lawrence Smira, Robert Ewing, Gary Wieser, Saliterman/Goldstein Investments (collectively, the "Paragon Group"), the Paragon Hotel Corporation and C.R.H.C. of Tucson, Inc. ("CRHC"). As a result of an objection to the petition and motion to dismiss filed by CRHC, an Amended Petition Commencing Involuntary Case Against Partnership was filed on April 1, 1992. An order for relief was entered on June 30, 1992.

Connecticut General is the Debtor's largest and only non-governmental secured creditor. It holds a secured lien against the Hotel in the sum of $8,597,300 as of the petition date. Connecticut General's claim is evidenced, *inter alia*, by a promissory note dated December 5, 1981, in the original sum of $7,500,000 and a deed of trust and security agreement executed on the same date. The note provides for monthly installments of principal and interest calculated at the rate of 14 percent per annum, together with additional interest equal to 20 percent of the "gross annual room revenues" of the Hotel in excess of $3,100,000. The note further provides for payment of interest at a specified default rate following a default by the Debtor.

The Debtor defaulted on its obligation to Connecticut General in the summer of 1991. Since that time the Debtor has not made any payments of principal or interest to Connecticut General.

Both the Paragon Group and CRHC filed plans of reorganization. The Paragon Plan contains eight classes of claims and interests. It purports to capitalize all outstanding principal and non-default rate interest on Connecticut General's claim as of the effective date of the Paragon Plan and to pay such claim over a seven-year period, with interest at the prime rate plus 1½ percent, based on a 25 year amortization schedule. It is undis-

puted that Connecticut General's claim is impaired under the Paragon Plan. Connecticut General voted to reject the Paragon Plan.

The Paragon Plan pays all other creditors in full. It pays all of the Class 6 general unsecured claims in cash, but delays payment for a period of 30 days, with interest paid on such claims at the prime rate.

The CRHC Plan also impairs Connecticut General's claim and proposes to pay all other creditors in full. It proposes to repay the Connecticut General loan at a base interest rate of 10 percent and offers Connecticut General a 40 percent participation in net cash flow and in the net proceeds of any sale or refinancing of the Hotel. The CRHC Plan proposes to remove the Paragon Group as the managing general partner of the Debtor, to install an affiliate of CRHC to operate the Hotel and to reduce the Paragon Group's aggregate ownership share in the Debtor from 45 percent to 22.5 percent. Connecticut General voted to accept the CRHC Plan.

Both plans propose to utilize all available cash of the estate as of the effective date. The Paragon Plan proposes to pay all creditors other than Connecticut General, implement a capital improvement plan and distribute all of the excess cash to the Debtor's general and limited partners. The CRHC Plan proposes to use the cash to pay all creditors, implement a capital improvement plan and reinstate the claim of Connecticut General.

On November 13, 1992, the bankruptcy court entered an order confirming the Paragon Plan and denying confirmation of the CRHC Plan. Connecticut General filed a notice of appeal and a motion for stay pending appeal. The bankruptcy court denied Connecticut General's motion for stay pending appeal. Connecticut General then sought a stay pending appeal from the Bankruptcy Appellate Panel. On December 27, 1992, the bankruptcy court entered an Amended Order Confirming the Paragon Plan. In response, Connecticut General filed an amended notice of appeal. On December 30, 1992, the BAP issued a temporary stay of the confirmation order, which was subsequently extended pending final disposition of this appeal.

## III

### STANDARD OF REVIEW

■ Whether a plan impairs a creditor's interest is a question of law subject to *de novo* review. *In re L & J Anaheim Associates,* 995 F.2d 940, 942 (9th Cir.1993); *In re Acequia, Inc.,* 787 F.2d 1352, 1357 (9th Cir. 1986).

■ The finding of good faith will not be overturned unless the opponent of the Chapter 11 plan can show that the finding was clearly erroneous. *In re Jorgensen,* 66 B.R. 104, 109 (9th Cir. BAP 1986); *In re Stolrow's Inc.,* 84 B.R. 167, 172 (9th Cir. BAP 1988). Likewise, the issue of whether a reorganization plan is fair and equitable involves questions of fact and will not be set aside unless clearly erroneous. *Great Western Bank v. Sierra Woods Group,* 953 F.2d 1174, 1176 (9th Cir.1992); *Debentureholders, etc. v. Continental Inv. Corp.,* 679 F.2d 264, 269 (1st Cir.1982) (Act case).

■ A bankruptcy court should be accorded substantial deference in making cramdown interest rate determinations. *In re Fowler,* 903 F.2d 694, 696 (9th Cir.1990). The determination of what factors to apply in a valuation calculation is an interpretation of a statute which is reviewed *de novo.* However, the application of these factors to a certain case is a question of fact which is reviewed under a clearly erroneous standard. *In re Patterson,* 86 B.R. 226, 227 (9th Cir. BAP 1988).

## IV

### DISCUSSION

A. *Whether This Appeal Is Moot*

The Debtor contends that this appeal should be dismissed as moot. By the time Connecticut General obtained a stay of the plan confirmation order, payments in full were made to creditors in Classes 1, 3, 5 and 6. A total of $24,665.95 was paid to four Class 1 administrative claimants, $139,550.80 was paid to five Class 3 tax claimants, $3,730.99 was paid to 49 Class 5 administrative convenience claimants and $155,942.24

was paid to 56 Class 6 general unsecured creditors. Payments on the Class 4 claim to Connecticut General were tendered but refused.

■ To dismiss this appeal on the basis of mootness, the Panel must find that the plan has been so substantially consummated that effective judicial relief is no longer available to the appellant. *Matter of Sun Country Development, Inc.*, 764 F.2d 406, 407 n. 1 (5th Cir.1985). Substantial consummation of a plan of reorganization turns on the facts of each case. *In re Jorgensen, supra,* 66 B.R. at 106. The word "substantial" suggests more than halfway, more than a mere preponderance. 66 B.R. at 107.

■ We will not dismiss this appeal as moot. The Paragon Plan has not been so substantially consummated that effective judicial relief is no longer available to the appellant. Although four of the eight classes have been paid, the Debtor has not paid Connecticut General's claim which exceeds $8 million. It is clear, these four classes would be paid under either plan. Further, Connecticut General did everything it could to stay the plan confirmation order. When the bankruptcy court refused to grant a stay of the order, Connecticut General appealed to the BAP and received a stay. Thus, this case differs from the cases cited by the Debtor, *In re Robert Farms, Inc.,* 652 F.2d 793, 795 (9th Cir.1981) and *In re Clarke,* 98 B.R. 979, 980 (9th Cir. BAP 1989), in which the courts cited the appellants' "procedural ineptitude" in failing to seek a stay of the plan confirmation orders.

B. *Whether a Properly Impaired Class has Accepted the Plan*

■ On the merits, Connecticut General asserts that the Paragon Plan should not have been confirmed because no properly impaired class accepted it. Under Bankruptcy Code ("Code") Section 1129(a)(10), a plan cannot be confirmed unless at least one "impaired class" accepts the plan, excluding acceptance by any insider. *In re Willows Convalescent Centers Ltd. Partnership,* 151 B.R. 220, 222 (D.Minn.1991). Connecticut General contends that the only reason the Paragon Plan paid the Class 6 general unsecured creditors 30 days after the effective date was to create an artificially impaired class which would vote for the plan. Connecticut General maintains that the Debtor had sufficient cash on the effective date to pay Class 6 claims at that time. It cites several cases holding that an alteration intended only to create an impaired class to vote for a plan so that a debtor can effectuate a cramdown will not be allowed. *In re Windsor on the River Associates, Ltd.,* 7 F.3d 127, 132 (8th Cir. 1993); *Willows Convalescent Centers Ltd. Partnership, supra,* 151 B.R. at 222; *In re Club Associates,* 107 B.R. 385, 401 (Bkrtcy. N.Ga.1989); *In re Lettick Typografic, Inc.,* 103 B.R. 32, 39 (Bkrtcy.Conn.1989).

Although it appears that the 30-day wait was employed solely to create a slightly impaired class to vote on the plan, a recent Ninth Circuit Court of Appeals case found a similar action permissible. In *L & J Anaheim Associates, supra,* 995 F.2d at 943, a secured creditor's rights and remedies under the Uniform Commercial Code were abrogated by that creditor's plan purporting to sell the creditor's collateral at public auction. The court in *L & J Anaheim Associates* noted that the plain language of Section 1124 states that a creditor's claim is "impaired" unless its rights are left "unaltered" by the plan. *Id.* The court interpreted the language in Section 1124 as Congress's way of defining impairment in the broadest possible terms. 995 F.2d at 942. The court found no suggestion that only alterations of a particular kind or degree can constitute impairment. 995 F.2d at 943. The court concluded that the narrow question that arises is whether a creditor's legal, equitable or contractual rights were changed by the plan. If so, its claim is considered impaired. *Id.*

■ The court then looked at the appellant's argument that the general rule defining impairment should not be used abusively, as where the plan proponent enhances its own position, then attempts to use this fact to show impairment and so cram down the rest of the creditors. 995 F.2d at 943 n. 2. The Court of Appeals held that abuses on the part of a plan proponent ought not affect the application of Congress's definition of impair-

ment. *Id.* Rather, such abuses should be addressed by the bankruptcy court by denying confirmation on the ground that the plan has not been proposed in good faith. *Id.* The Court of Appeals concluded that the bankruptcy court's finding that the plan was proposed in good faith was not clearly erroneous. *Id.* In sum, *L & J Anaheim Associates* holds that a plan proponent's motivations will not be questioned in determining whether a class is impaired under Section 1129(a)(10), but will be examined in deciding whether a plan was proposed in bad faith.

This Ninth Circuit case is binding on the Panel, while cases such as *Windsor on the River Associates, supra,* have persuasive authority only. Aside from our duty to follow Ninth Circuit precedent, we find the reasoning in *L & J Anaheim Associates* more convincing than that in the Eighth Circuit case of *Windsor on the River Associates.* The Eighth Circuit held that a claim is not impaired if the alteration of rights arises solely from the plan proponent's exercise of discretion. 7 F.3d at 132. The court determined that two classes in the debtor's plan were not impaired, because the plan could have provided for these classes in full on the effective date if it had paid $100,000 less to the secured creditor. *Id.*

■■■■ We do not believe it is the bankruptcy court's role to ask whether alternative payment structures could produce a different scenario in regard to impairment of classes. Denying confirmation on the basis that another type of plan would produce different results would impede desired flexibility for plan proponents and create additional complications in the already complex process of plan confirmation. Moreover, nowhere does the Code require a plan proponent to use all efforts to create unimpaired classes. *See* Carlson, *The Classification Veto in Single–Asset Cases under Bankruptcy Code Section 1129(a)(10),* 44 S.C.L.Rev. 565, 614 (1993) ("The rules pertaining to impairment do establish certain consequences pertaining to voting; but nowhere is it written that a debtor-in-possession has a duty to maximize the opportunity for one single creditor to veto the proceedings"). Such a requirement should not be imposed by judicial fiat.

■■■■ The Paragon Plan provided that payment to the Class 6 general unsecured creditors would be delayed for 30 days. Therefore, based on *L & J Anaheim Associates,* the class was impaired. The ability of the Debtor to pay that class on the effective date does not alter that analysis. However, the necessity for the delay in payment may be considered in determining if Paragon proposed its plan in good faith.

## C. Whether the Plan Was Proposed in Good Faith

Connecticut General argues that the Paragon Plan was proposed in a bad faith attempt to artificially impair the Class 6 claims and to benefit the Debtor's general and limited partners. The Debtor responds that because the issue of bad faith was not raised in the bankruptcy court, the issue should not be considered on appeal. Contrary to the Debtor's assertion, the issue was expressly raised in the bankruptcy court, on page 11 of Connecticut General's objection to the Paragon Plan.

■■■■ The court did not make any findings regarding good faith. The only finding remotely addressing the issue is in the November 13, 1992 order confirming the plan, in which the court stated: "IT IS FURTHER ORDERED that all the objections to the Paragon plan are overruled, the Paragon plan satisfies the requirements of section 1129, and the First Amended Plan of Reorganization Proposed By the Paragon Group on Behalf of the Debtor, Hotel Associates of Tucson, dated July 27, 1992 and filed July 28, 1992, is CONFIRMED."

■■■■ This is an insufficient substitute for findings of fact in resolving the contested issue of good faith. *In re Tucker,* 989 F.2d 328, 330 (9th Cir.1993); *Great Western Bank v. Sierra Woods Group, supra,* 953 F.2d at 1176–77. Therefore we will remand this matter to the bankruptcy court for findings on whether the plan was proposed in good faith. On remand the court should recognize that the act of impairment in an attempt to gerrymander a voting class of creditors is indicative of bad faith. *In re Woolley's Parkway Center, Inc.,* 147 B.R. 996, 1003

(M.Fla.1992); *In re Meadow Glen, Ltd.,* 87 B.R. 421, 427 (W.Tex.1988).

### D. *Whether the Plan Is Fair and Equitable*

▪ Section 1129 of the Code permits a plan to be "crammed down" over the objection of dissenting creditor classes, subject to the bankruptcy court's determination that the plan treats those classes fairly. *L & J Anaheim Associates, supra,* 995 F.2d at 942. Connecticut General contends that the Paragon Plan is not fair and equitable because it does not provide for the default rate of interest provided in Connecticut General's promissory note, which should be paid when the estate is solvent or when the creditor is oversecured. Alternatively, Connecticut General asserts that it actually may be undersecured and hold a substantial unsecured deficiency claim against the Debtor. Connecticut General maintains that the Paragon Plan is not fair and equitable because it makes no provision for such an unsecured claim.

▪ In this case, there are no findings regarding whether the Debtor is solvent and whether Connecticut General is oversecured or undersecured. The only finding addressing the issue of whether the plan is fair and equitable is in the November 13, 1992 order stating that the Paragon Plan satisfied the requirements of Code Section 1129. Again applying the *Tucker* and *Sierra Woods Group* cases, the Panel will remand this appeal so that the bankruptcy court may make findings regarding whether the Paragon Plan is fair and equitable, including whether the Debtor is solvent or whether Connecticut General is oversecured and, if so, whether the Debtor should be required to pay interest to Connecticut General at the default rate specified in the loan documents. *See In re Entz–White Lumber and Supply, Inc.,* 850 F.2d 1338 (9th Cir.1988).

Finally, Connecticut General contends that the Paragon Plan violates the minimum standard for determining whether a plan is fair and equitable, as set forth in Section

1129(b)(2)(A)(i). This Section provides that to the extent a secured creditor does not accept the treatment of its claim under a debtor's plan, the plan must provide for the payment of interest on any deferred payments to the creditor at a rate that will allow the creditor to receive the present value of its allowed secured claim.

▪ To determine whether a secured creditor has been provided the present value of its claim, the bankruptcy court must make a case-by-case determination of what interest the reorganizing debtor would have to pay a creditor in order to obtain a loan on equivalent terms in the open market. *In re Camino Real Landscape Maint. Contractors,* 818 F.2d 1503, 1508 (9th Cir.1987); *In re Patterson, supra,* 86 B.R. at 228. The appropriate interest rate is the prevailing market rate for that type and quality of loan. *In re Welco Industries, Inc.,* 60 B.R. 880, 883 (9th Cir. BAP 1986).[1]

▪ The bankruptcy court in this case made no findings regarding the market rate of interest. In *Fowler, supra,* 903 F.2d at 698, the Court of Appeals found itself unable to determine whether the rate of interest was clearly erroneous and remanded the case for the bankruptcy court to make explicit findings regarding its calculations of the appropriate interest rate. In order to allow the Panel to conduct a meaningful review of the bankruptcy court's cramdown interest rate determination, on remand the bankruptcy court is directed to explain whether and why the interest rate proposed in the Paragon Plan is fair and equitable.

### E. *Whether the Court Erred in Failing to Consider Connecticut General's Preference for the CRHC Plan*

▪ Lastly, Connecticut General argues that the court erred in failing to consider its preference for the CRHC Plan, as it was required to do under Section 1129(c). This section provides that the court may confirm only one plan and further states: "If the requirements of subsections (a) and (b) of this section are met with respect to more

---

1. Some of these cases involved unsecured tax claims governed by Section 1129(a)(9)(C). However, because language similar to the language of Section 1129(a)(9)(C) appears in subsections 1129(b)(2)(A), the analysis should prove useful to courts considering secured claims. *See Camino Real Landscape Maint. Contractors, supra,* 818 F.2d at 1504 n. 1.

than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm."

A reading of the transcript suggests that the bankruptcy court believed that the CRHC Plan was not fair and equitable as required by Section 1129(b). The court called the CRHC Plan a "sweetheart plan" for Connecticut General and at one point stated that the CRHC Plan "smells." However, these statements cannot substitute for the findings necessary for an adequate review on appeal. On remand, the court should specify whether the CRHC Plan meets the requirements of Sections 1129(a) and (b), and if so, should consider the preferences of creditors and equity security holders in determining which plan to confirm.

## V

### CONCLUSION

The plan confirmation orders are **VACATED** and we **REMAND** so that the court may make findings regarding whether the Paragon Plan was proposed in good faith and whether it is fair and equitable. The court should also determine whether, under Section 1129(c), the CRHC Plan should have been confirmed instead of the Paragon Plan.