In re PATRICIAN ST. JOSEPH PARTNERS LIMITED PARTNERSHIP, an Arizona limited partnership, Debtor.

The MUTUAL LIFE INSURANCE COMPANY of NEW YORK, Appellant,

v.

PATRICIAN ST. JOSEPH PARTNERS LIMITED PARTNERSHIP, Debtor, Appellee.

No. CIV 94–034 TUC RMB.
Bankruptcy No. 92–02461–TUC–LO.

United States District Court, D. Arizona.

June 9, 1994.

Patrick E. Hoog, Eugene F. O'Connor, II, Phoenix, AZ, for appellant.

Michael McGrath, Scott H. Gan, Tucson, AZ, for appellee.

## ORDER

BILBY, District Judge.

### I. STATEMENT OF THE CASE

Mutual Life Insurance Company of New York ("MONY") appeals the bankruptcy court's order confirming Patrician St. Joseph Limited Partnership's (the "Debtor's") Plan of Reorganization. (Bankruptcy Court Docket No. 256; hereinafter DN 256). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 158(a).

### II. STATEMENT OF FACTS

The Debtor's limited partnership was formed solely to acquire and manage a medical office complex known as St. Joseph's Medical Plaza (the "Property") located behind St. Joseph's Hospital in Tucson, Arizona. Fee title to the property is held by St. Joseph's Hospital of Tucson, Inc. (the "ground lessor"). St. Joseph's Hospital leased the land to St. Joseph's Mediplex Associates pursuant to a ground lease dated

February 28, 1983. The leasehold was then sold to the Debtor on December 31, 1985, after the medical complex building was constructed. The term of the ground lease extends through February, 2018, and contains options to extend the term through February, 2048. The sole general partner of the Debtor is L.R.T. Medical Associates Limited Partnership. As general partner of the Debtor, L.R.T. has managed the affairs of the Debtor since its inception. Louis Trigg whose financial acumen is relevant to this appeal is the managing partner of L.R.T.

On June 15, 1987, MONY Pension & Insurance Corporation loaned the Debtor $7,800,-000. (DN 4) At the time this loan was made, Debtor owned the leasehold title to the Property and the ground lessor agreed to subordinate and subject its interest to a first priority lien in favor of MONY Pension. (DN 19, Ex. 2 and 6) The loan from MONY to the Debtor had a five year term and provided for the payment of interest at the rate of 9.5% per annum; required monthly interest only payments in the sum of $61,750 through July 1, 1992, at which time the entire principal and all accrued interest and all other sums due under the Note would become due and payable. (DN 4; Ex. A) On July 15, 1992, MONY Pension assigned its interest in the Debtor's loan to Appellant MONY.

Prior to July 1, 1992, Debtor attempted unsuccessfully to negotiate an extension of the term of the loan with MONY. (DN 109, p. 5; DN 241) Debtor defaulted on the loan when it did not pay the full balance due under the MONY Promissory Note on July 1, 1992. To avert foreclosure by MONY, Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on August 4, 1992. At the time of the filing of Debtor's bankruptcy case, MONY was owed $8,092,926.18. (Carnahan Affidavit, DN 221, ¶ 10) On October 20, 1992, an MAI appraisal prepared by Coopers & Lybrand for MONY valued the Debtor's leasehold at $8,600,000. (DN 45, ¶ 13, and Ex. A)

This appeal represents competing plans of reorganization filed by the Debtor and MONY. Debtor's Plan proposes to pay all creditors in full. MONY's loan is extended for a period of ten years, with interest at 8% per annum as determined by the bankruptcy court based on a 25–year amortization. The remaining undersecured lienholders and unsecured creditors are to be paid during the term of the Plan or upon sale or refinance of the property. (DN 122, 123).

MONY's competing plan grants Debtor a two year period in which to sell or refinance the leasehold. During the two year term, the Debtor is to make monthly principal and interest payments based on a 20 year amortization at a market interest rate of 9.5% per annum. MONY's plan further provides for administrative claims to be paid in full from the rental income generated by the leasehold. Unsecured creditors will receive cash distributions equal to 90% of the allowed amount of their claims on the effective date of MONY's plan. Upon sale of the leasehold, creditors holding secured claims with liens will be paid their allowed secured claims from the proceeds of the sale in order of their priority. Any remaining amounts will be paid to holders of interest in the Debtor. (DN 217)

All creditors except for MONY voted in favor of Debtor's Plan, and all of them voted to reject MONY's proposed plans. (DN 133–150, 161–174, 180, 182, 184, 213, 215, 216, 255, 256) Both plans were considered for confirmation at a hearing held in the bankruptcy court on November 8, 1993, before the Hon. Lawrence Ollason. On December 8, 1993, Judge Ollason entered his Order Confirming Debtor's Plan of Reorganization.

## III. STANDARD OF REVIEW

A bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law, *de novo*. *In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503, 1505 (9th Cir.1987). Where the question requires consideration of legal concepts in mix with facts and law, the issue is reviewed *de novo*. *In re Safeguard Self–Storage Trust*, 2 F.3d 967, 970 (9th Cir. 1993).

## IV. ISSUES PRESENTED

The Court finds that this appeal presents the following issues for disposition:

(1) Whether Debtor's Plan of Reorganization satisfies the feasibility requirement of § 1129(a)(11);

(2) Whether Debtor has two impaired accepting classes of claims under § 1129(a)(10);

(3) Whether the Bankruptcy Court erred in holding that Debtor's Plan satisfies the "best interests of creditors" requirement of § 1129(a)(7) and is "fair and equitable" under § 1129(b)(2);

(4) Whether Debtor's Plan is a "full repayment plan" as to each class of claims under the Plan;

(5) Whether the Bankruptcy Court erred in confirming Debtor's Plan without explicitly ruling on MONY's evidentiary objections;

(6) Whether the Debtor's Plan is preferable to MONY's Plan under § 1129(c).

## V. DISCUSSION

### A. Whether the Debtor's Plan of Reorganization Satisfies the Feasibility Requirement of § 1129(a)(11).

■ MONY asserts that Debtor's Plan is not feasible because (1) the lease of the Debtor's largest tenant expires four years into the ten year term of the Debtor's Plan; (2) the Debtor's financial projections fail to apply any inflation factor to operating expenses; (3) Debtor's financial projections underestimate anticipated tenant improvement costs; (4) the Debtor's Plan provides for inadequate capital contributions; and (5) it is not possible to determine what the required payments to MONY will be under the Debtor's Plan. The question of whether a plan is feasible is a question of fact which this Court will review under the clearly erroneous standard and will not reverse the bankruptcy court absent a finding of abuse of discretion. *In re Acequia, Inc.,* 787 F.2d 1352, 1358, 1365 (9th Cir.1986).

### 1. *Feasibility Standard*

■ Section 1129(a)(11) of the United States Bankruptcy Code (the "Code") sets forth the feasibility requirement and provides that a plan may be confirmed only if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable. *5 Collier on Bankruptcy* § 1129.02[11] (15th ed. 1992). The prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required. *Id.* The mere potential for failure of the plan is insufficient to disprove feasibility. *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 762 (Bankr.S.D.N.Y.1992); *See also In re Acequia, Inc.,* 787 F.2d 1352 (9th Cir. 1986).

### 2. *Group Health Medical Associates*

■ Group Health Medical Associates ("GHMA") is the Debtor's largest tenant and accounts for approximately two-thirds of the medical center's rental income. (DN 241 at 24) GHMA's lease expires four years into the ten year term of Debtor's Plan. (DN 241 at 24) MONY asserts that the Debtor has taken no action to renew the GHMA lease and in fact alleges that the Debtor has made a "side deal" to replace GHMA with a lessee who will be more willing than GHMA to refer business to the Sisters of Carondelet ("Carondelet"). MONY argues that the uncertainty with the GHMA lease establishes that Debtor's Plan is not feasible. The Court disagrees.

The evidence supports that Debtor has successfully managed this property for approximately eight years with no indication that it cannot do so in the future. MONY's note was never in default prior to its maturity on July 1, 1992. The property has been 100% occupied throughout the bankruptcy proceeding. (DN 122 at 4) The Debtor has been managed by Louis Trigg, the same general partner both prior to, and after the

filing of, the bankruptcy petition. This general partner will also remain the Debtor's general partner after confirmation. (*Id.* at 13) Indeed, there is no evidence that the GHMA's lease will not be extended. There is no evidence that the Debtor has used poor business judgment in the past to support Mony's present conclusion that Debtor would commit financial suicide by refusing to negotiate with GHMA before finding an equally viable replacement.

### 3. *Financial Projections re: Inflation Factor, Tenant Improvement Costs and Capital Contributions*

■ MONY asserts that the Debtor's financial projections fail to apply any inflation factor to operating expenses, underestimate anticipated tenant improvement costs and provide for inadequate capital contributions. MONY relies on its feasibility expert, Edward McDonough [1] to support these claims. (DN 151) According to McDonough, Debtor's financial projections underestimate the anticipated tenant improvement costs by $310,485. McDonough opines that once Debtor's financial projections are modified to reflect adjustments for inflation and tenant improvements, the Debtor's financial projections will produce a negative balance of $540,787 at the end of the ten year projection period. (DN 151, ¶ 4(c)) Additionally, McDonough concludes that if capital contributions are limited to only the $100,000 provided for in the Disclosure Statement, this already existing negative balance will increase accordingly. (DN 151, ¶ 5) Thus, MONY argues that Debtor's Plan is not feasible because the Plan provides for only $100,000 in capital contributions, while the Debtor's income and expense projections require capital contributions of $230,000 in order for the property to have a positive cash flow.

In contrast, the property manager for the Debtor, Swain Chapman of Chapman Lindsey Real Estate, submitted an affidavit in which he attests that there is sufficient income to make mortgage payments, pay operating expenses, taxes and other expenses based on his financial projections. Chapman's affidavit and deposition testimony support a finding that he is knowledgeable of this Property and the Tucson market based on his years of real estate experience. Chapman's financial projections for the Property are attached to his affidavit. (DN 179, Ex. A) These projections envision $230,000 in capital contributions required from 1993 through 1997. (*Id.*) Chapman also testified at the confirmation hearing that it was his understanding that the $230,000 would be raised from Debtor's partners. (DN 241) Chapman concludes that the willingness of the equity holders to contribute monies sufficient to maintain and support the project, together with cash flow make the plan feasible even if the 8% interest rate on the obligation owed to MONY is increased. (DN 179 at 3)

At deposition, the Debtor's managing partner, Louis Trigg, testified that the additional capital reserves would be raised from the Debtor's partners. (DN 265 at 180) Trigg also testified that in the event these contributions could not be raised from the partners, he would raise the money personally. (DN 180–182) MONY argues this is an empty promise since Trigg has not provided financial statements to establish that he is financially capable of raising additional capital contributions.

The monies for the initial contribution have been raised. The Court questions the reliability of present financial statements to be used to project fund raising capability several years in the future. Moreover, Trigg has a personal and financial interest in seeing that this Property succeeds since he has been involved in the Property since 1985. (DN 178, ¶ 16) At the Confirmation Hearing, Chapman confirmed this fact when he testified that he had no reason to believe that Trigg could not raise the capital contributions. (DN 241 at 35)

Finally, St. Joseph's Hospital is contiguous to the Property and has an obvious economic interest in having the leasehold full and occupied with referring physicians, HMOS and

---

1. MONY does not contest Debtor's claim that McDonough is a Phoenix-based consultant who has never visited the subject property.

the like. The evidence supports that St. Joseph's and the Debtor have worked, and will continue to work together to maintain the high occupancy in the Property. (DN 241 at 35–37). Thus, the earning power of its operations, capital structure, desirability of location and economic conditions fully support the bankruptcy court's conclusion that the Plan is feasible. (DN 178, 179, 241, 242, 245, 252, 255)

There was no evidence presented to the bankruptcy court that the equity partners, nor Trigg cannot infuse the Property with the capital contributions as projected by Swain Chapman. Whether a Debtor will be able to make payments under the Plan as required, is a factual determination to be made by the bankruptcy court. *In re Cheatham*, 91 B.R. 377, 379 (E.D.N.C.1988). The bankruptcy court conducted the confirmation hearing and was in a better position then this Court to determine the weight and credibility of the testimony offered there.

### 4. *Allowance of MONY's Secured Claim*

■ MONY argues that the bankruptcy court did not have an adequate basis for its determination that the Debtor's Plan is feasible because it did not rule on the allowance of MONY's secured claim, MONY's entitlement to default interest and attorneys' fees, and the disposition of $237,339.81 in prepetition rents. On August 4, 1992, when Debtor filed its petition, MONY's secured claim was $8,092,926.18. (DN 221, ¶ 10). On that same date according to MONY, the value of Debtor's property securing MONY's claim was $8.6 million. (DN 155, ¶ 3) Today, MONY submits that its Allowed Secured Claim is $8,618,806.63. This includes two contested areas, default interest in the amount of

$1,463,292.44 and attorneys fees and related costs in the amount of $221,026.49.

Chapter 11 has two major objectives: (1) to permit successful rehabilitation of debtors (*NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 527, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984)); and (2) to maximize the value of the estate (*Toibb v. Radloff*, 501 U.S. 157, 163–65, 111 S.Ct. 2197, 2201, 115 L.Ed.2d 145 (1991)). The Code broadly states that a Chapter 11 plan shall "provide adequate means for the plan's implementation, such as . . . curing or waiving of any default." 11 U.S.C. § 1123(a)(5)(G). In this case, that means curing the event that triggered the default and returning to pre-default conditions. This "curing" event occurred on March, 1993, when Debtor brought current all past non-default interest due pursuant to the Stipulated Cash Collateral Order.[2] The difference between the non-default rate of interest (9.5%) and the default rate of interest (15%) is 5.5%. Thus, MONY is entitled to additional interest at a default rate of 5.5% from July, 1992 (date of default) until March, 1993 (date of cure) in the amount of $330,-000.[3]

Thus, on the date of confirmation, MONY was owed the original principal amount of its note, $7.8 million plus the additional $330,000 in default interest for a total of $8,130,000. According to MONY's expert, the Property is valued at $8.6 million. Even if attorneys' fees and costs are included the conclusion remains the same, MONY is an oversecured creditor.

Consequently under 11 U.S.C. § 506(b), MONY as an oversecured creditor, is entitled to reasonable fees and expenses. Additionally, MONY's loan instruments contain lan-

---

**2.** On February 23, 1994, the bankruptcy court entered a Stipulated Order conditioning the Debtor's use of MONY's cash collateral. In addition to providing for the Debtor's use of the rents to operate the property, the Stipulated Order provided for payment of non-default interest that had accrued from July, 1992, as though no default had occurred for monthly interest only payments to MONY and for the payment to MONY of "excess rents." MONY received (1) all of the accrued non-default interest it was owed on March 8, 1993; (2) monthly interest only payments of $61,750; and (3) excess rents on March 18, 1993, May 3, 1993, and July 12, 1993. (DN

221, ¶ 8) These payments represent accrued, but unpaid interest previously deferred by agreement of the parties, calculated as though no default had occurred. (DN 55, § H) Thus, as of September 30, 1993, MONY has received $1,049,750 and continues to receive monthly interest only payments of at least $61,750 from October, 1993 to date.

**3.** While this figure has been submitted by the Debtor, any inaccuracy in calculation would have to be substantial in order to affect the conclusion reached by this Court.

guage requiring the Debtor to pay for reasonable attorneys' fees resulting from non-performance of the obligation under the loan. Thus, there can be no contest that MONY is due reasonable fees and costs. The Debtor, however, asserts that MONY's attorneys fees and costs are unreasonable since its request represents almost four times the aggregate sum of fees incurred by Debtor's present and past counsel. The task of evaluating MONY's request on this subject, however, is best left to the bankruptcy judge and need not be precisely determined prior to plan confirmation.

Finally, MONY asserts that it is legally entitled to immediate payment of certain pre-petition rents and that because the Debtor's Plan does not provide for the disposition of these funds, the bankruptcy court's order confirming the Debtor's Plan must be reversed. It is uncontested that on the date the Debtor filed its Chapter 11 petition, Debtor held $237,339.81 in prepetition rents. (DN 14) Paragraph 1.06 of the Deed of Trust executed between the Debtor and MONY provides for an absolute assignment of rents, and grants the Debtor a license to collect the rents so long as the Debtor is not in default under the parties' loan documents. MONY perfected its interest in the prepetition rents when it recorded its Deed of Trust and Assignment of Rents with the Pima County Recorder's office on June 15, 1987. *See In re Scottsdale Medical Pavilion,* 159 B.R. 295 (9th Cir. BAP 1993). The Debtor defaulted when it did not pay the loan balance which matured by its own terms on July 1, 1992. Thus, upon the Debtor's default, the license to collect and receive rents was revoked and MONY's was had "an interest" in the rents collected by the Debtor within the meaning of 11 U.S.C. § 363(a). Pursuant to section 363, the prepetition rents constitute MONY's cash collateral. *Scottsdale Medical,* 159 B.R. at 301.

Under § 363(e), the debtor must provide "adequate protection" of the creditor's interest as a condition of using cash collateral. Adequate protection may be provided by (1) making periodic cash payments or equivalent to the decrease in the value of the creditor's interest; (2) an additional or replacement

lien on other property; or (3) other relief that provides the "indubitable equivalent" of the creditor's interest in the property. 11 U.S.C. § 361. A classic method for finding adequate protection is the existence of an equity cushion. In fact, it has been found that an equity cushion standing alone can provide evidence of adequate protection for a secured claim. *In re Mellor,* 734 F.2d 1396, 1400 (9th Cir.1984).

In this case, MONY is an oversecured creditor with an equity cushion in the Property. The Debtor's Plan provides that MONY's claim encompasses every claim relating to the obligations owed to MONY by the Debtor. (DN 123 ¶ 8) The Plan states: "[t]he Plan will provide repayment to its secured creditor, MONY, to the extent of MONY's secured claim." (DN 123 at 4) Therefore under the Plan, MONY's interests are protected.

The evidence also supports the finding by the bankruptcy judge that the Debtor was in need of funds to implement its reorganization plan. Therefore, MONY is not entitled to immediate possession of the prepetition rents. These sums shall be included in its secured claim and paid out according to the Debtor's Plan.

In summary, as a matter of law, the amount of MONY's default interest can be determined and since MONY's interest is adequately protected it is not entitled to immediate prepetition rents. The bankruptcy court's confirmation of the Debtor's Plan prior to ruling on MONY's request for attorney's fees and related costs is not reversible error. After the bankruptcy judge rules on MONY's application for fees and costs, its secured claim can be determined with certainty and calculated with precision.

**B. Whether the Debtor has two impaired accepting classes of claims under § 1129(a)(10)**

Under section 1129(a)(10), "a plan cannot be confirmed unless at least one 'impaired class' accepts the plan, excluding acceptance by any insider." *In re Hotel Associates of Tucson* 165 B.R. 470, 474 (9th Cir. BAP 1994). MONY asserts that Debtor's Plan artificially impairs the claims of Carondelet

(Class 5) and the unsecured creditors (Class 8) in an attempt to obtain an impaired accepting class of claims under Section 1129(a)(1). According to MONY the Debtor cut another "side deal" with Carondelet to reduce the Debtor's monthly ground lease payments by an insignificant sum. The Class 8 unsecured creditors whose aggregate claims amount to approximate $40,000 are also artificially impaired, argues MONY, since the Plan delays repayment of 50% of these claims for twelve months.

"Whether a [P]lan impairs a creditor's interest is a question of law subject to *de novo* review." *In re L & J Anaheim Associates,* 995 F.2d 940, 942 (9th Cir.1993). "The finding of good faith will not be overturned unless the opponent of the ... plan can show that the finding was clearly erroneous." *Hotel Associates,* 165 B.R. at 473. 11 U.S.C. § 1122(b) provides that "[a] plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." The fact that claims are administratively consolidated and treated separate from other general unsecured claims does not diminish the fact that they may be impaired, and does not preclude them from being an impaired class of claims for purposes of Plan confirmation pursuant to 11 U.S.C. § 1129(a)(10). A bankruptcy court's finding that claim is or is not "substantially similar" to other claims within the meaning of 11 U.S.C. § 1122(a) constitutes a finding of fact reviewable under the clearly erroneous standard. *See In re Johnston,* 140 B.R. 526, 528 (9th Cir. BAP 1992).

Here, MONY asserts that the Debtor has in bad faith artificially impaired two claims which would vote for the Debtor's Plan in order to effectuate a "cramdown" on MONY as the dissenting creditor. In *In re Hotel Associates of Tucson,* a creditor claimed that the Debtor had sufficient cash on the effective date to pay certain "impaired" claims and therefore, the claims were artificially impaired in order to create an impaired class to vote for the plan. 165 B.R. at 474. *Hotel Associates* found that despite the fact that the debtor's plan delayed payment to the general unsecured creditors for thirty days, that class was nevertheless impaired as defined by the Bankruptcy Code. *Id.,* 165 B.R. at 475. As that court noted, it is not the court's role to ask whether alternative payment structures could produce a different scenario in regard to impairment of classes; nor does the Code require that a plan proponent use all efforts to create unimpaired classes. *Id.*

Under the Debtor's Plan, the Class 5 claimant is to receive a reduction in monthly payments from $5,613.09 to $5,500 or a reduction of $113 per month. (DN 123 at 7). The Court does not find this amount *de minimis* because it represents a substantial sum over the term of the Plan.

With regard to the Class 8 unsecured creditors impairment of a claim does not require a finding of any particular kind or degree, only that a creditor's rights are left altered by the Plan. *L & J Anaheim Associates,* 995 F.2d at 943. Since the unsecured creditors will not be paid in full until one year after the effective date, their legal, equitable and contractual rights have been altered. Thus, as a matter of law the claims Class 5 and Class 8 are impaired as defined by the Bankruptcy Code.

A Plan, however, should not be confirmed where the bankruptcy court finds that a plan has not been proposed in good faith. *Id.* 995 F.2d at 943 n. 2; *In re Tucker,* 989 F.2d 328, 330 (9th Cir.1993). To satisfy the requirement of good faith, the proposed plan "must be intended to achieve a result consistent with the objectives of the Bankruptcy Code." *In re Corey,* 892 F.2d 829, 835 (9th Cir.1989) (citations omitted), *cert. denied,* 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990). MONY asserts that the bankruptcy court erred when it did not make explicit findings regarding good faith in response to MONY's assertions of bad faith.

A bankruptcy court's finding of good faith is reviewed under the clearly erroneous standard. *In re Caldwell,* 851 F.2d 852, 858 (6th Cir.1988). The standard of adequacy of factual findings is "whether they are explicit enough on the ultimate issues to

give the appellate court a clear understanding of the basis of the decision and to enable it to determine the grounds on which the trial court reached its decision." *Louie v. U.S.,* 776 F.2d 819, 822–23 (9th Cir.1985) (quoting *Nicholson v. Bd. of Education Torrance Unified School District,* 682 F.2d 858, 866 (9th Cir.1982)).

▮ The evidence is sufficient for this Court to conclude that the bankruptcy judge's finding of good faith is supported by the record. Under Debtor's Plan, MONY will receive deferred cash payments totaling the allowed amount of its claim while retaining its lien on the Property. This Plan is designed to avoid a liquidation which would in all probability prejudice the interests of the junior creditors. The evidence supports a finding that Debtor's Plan provides for full repayment of all creditors, will continue the operations of the business and not negatively impact jobs or the economy.

Additionally, other impaired classes have accepted Debtor's Plan. The allowed secured claim of the Federal Deposit Insurance Corporation (Class 6) is impaired.[4] The FDIC's claim is secured by a third priority lien on the Debtor's property. The outstanding amount owed on the FDIC claim is approximately $1,500,000. (DN 122, 123) Pursuant to Debtor's Plan, the FDIC has agreed to accept payments over time of its claim with full repayment upon sale or refinance of Debtor's property no later than ten years after the effective date of the plan. (DN 122, 123) By virtue of the treatment of the FDIC's claim under the terms of the Debtor's Plan, the FDIC's legal, equitable and contractual rights have been altered. But for the Debtor's Plan, the FDIC would have the legal right to foreclose on Debtor's property. This impairment is not artificial and constitutes a valid impaired class that voted in favor of the Debtor's Plan. (DN 216)

Additionally, Class 7 claims are impaired and yet voted in favor of Debtor's Plan. This Class consists of the claims of unsecured creditors to the extent the claims are not more than $250 in the aggregate. (DN 122, 123) The Plan provides for payment of these claims ninety days after the effective date of the Plan, without interest. This constitutes an alteration of these claimant's legal, equitable or contractual rights. This impairment is not artificial and constitutes a valid impaired class that voted in favor of the Plan.

Finally, a fifth impaired class is represented by the FDIC's unsecured deficiency claim (Class 9). The Plan proposes that this claim will be paid at the earlier of the tenth anniversary of the effective date of the Plan, or on the sale of the property. (DN 122, 123) This alters the rights the FDIC would have under its original collateral assignment documents, yet FDIC voted in favor of the Debtor's Plan. (DN 216).

Thus, substantial evidence supports a finding that Debtor has at least one impaired class of claims voting in favor of the Plan and that Debtor's Plan was proposed in good faith. The bankruptcy court order confirming the Plan on this basis was not clearly erroneous.

**C. Whether the Bankruptcy Court erred in holding that Debtor's Plan satisfies the "best interests of creditors" test of § 1129(a)(7) and that the Debtor's Plan is "fair and equitable" under § 1129(b)(2)**

**1. *11 U.S.C. § 1129(a)(7)***

▮ Whether a plan is in the best interest of creditors as required by 11 U.S.C. § 1129(a)(7) is a factual determination and reviewed under the clearly erroneous standard. *See Kane v. Johns–Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988).

11 U.S.C. § 1129(a)(7) provides in relevant part:

With respect to each impaired class of claims or interests—

(A) Each holder of a claim or interest of such class—

---

4. MONY attempts to argue that the FDIC claim is an "insider" claim because it arose from loans made between L.R.T., and Louis Trigg. This argument borders on the frivolous. The proscription against recognizing insider claims is to prevent collusion between parties of interest to the detriment of the other creditors. MONY cannot seriously argue that this danger traveled from a previous insider to the government entity who now holds the lien.

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of this Title on such date. . . .

This requirement has been commonly referred to as the "best interests of creditors" test and compliance is a prerequisite to plan confirmation. *In re Edgewater Motel, Inc.,* 85 B.R. 989, 992–996 (Bankr.E.D.Tenn.1988). The plan proponent, the Debtor in this case, has the burden of proving by a preponderance of the evidence that the Plan satisfies this test. *In re Hoosier Hi–Reach, Inc.,* 64 B.R. 34 (Bankr.S.D.Ind.1986).

██ MONY argues that the Debtor's Plan does not satisfy the best interest of creditors test pursuant to section 1129(a)(7) because the Plan provides for payment of MONY's claim based on a below-market interest rate and with terms unacceptable in the current commercial real estate market. However, MONY, as an oversecured creditor, does not have standing to raise the "best interest of creditors" test. *See In re Computer Optics, Inc.,* 126 B.R. 664, 666 (Bankr. D.N.H.1991). Nonetheless, there was sufficient evidence presented by Debtor for the bankruptcy court to conclude that Debtor's Plan survives this test. (DN 178, 179, 242, 262 at 139–142, 31–32, 37–38) Therefore, the bankruptcy court did not commit clear error when it found Debtor's Plan to be in the best interests of the creditors. (DN 255 ¶ 5)

### 2. *"Fair and Equitable" under 11 U.S.C. § 1129(b)(2)*

#### a. *Ten year Repayment Term*

██ Whether a Plan is fair and equitable involves questions of fact and will not be set aside unless clearly erroneous. *Great Western Bank v. Sierra Woods Group,* 953 F.2d 1174, 1176 (9th Cir.1992). Section 1129(b)(2) provides in relevant part:

For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides

\*　　\*　　\*　　\*　　\*　　\*

(i)(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. . . .

11 U.S.C. § 1129(b)(2).

██ MONY argues that the Debtor's Plan is not "fair and equitable" under § 1129(b)(2) because (1) it imposes a ten year repayment term; (2) imposes an interest rate of 8% per annum; and (3) violates the absolute priority rule. The stimulus which triggered this bankruptcy was the balloon payment on MONY's five year note which Debtor could not pay. MONY now argues that because the loan matured prior to Debtor's Chapter 11 filing, the ten year repayment term at 8% is unfair and inequitable.

Relying on *In re Mulnix,* 54 B.R. 481 (Bankr.N.D.Iowa 1985), the bankruptcy court determined that a repayment period of ten years was not excessive considering that "such loans are given for periods exceeding ten years." (DN 255 ¶ 3(a)) MONY asserts that the court's reliance on *Mulnix* was in error as that case concerned a dissolution decree. In *Mulnix,* the dissolution decree required that the husband pay his former wife $120,000 within 18 months. *Id.,* at 482–483. After defaulting on this obligation, the husband declared bankruptcy. The ex-wife unsuccessfully attempted to argue that since she was not a creditor in the true sense of the word, the debtor/ex-husband could not extend the term of her 18–month obligation to a twenty year loan. *Id.* at 483.

While MONY is correct that *Mulnix* concerned whether an ex-spouse with a judgment lien could be treated as a creditor within the meaning of the Code, that decision also provided enlightening discussion on whether extending a note by 17½ years was fair and reasonable. The *Mulnix* court

found persuasive that such a payout over 20 years was not excessive or unreasonable when the collateral is real estate. *Id.*, at 484. *Mulnix* relied on two decisions where courts confirmed plans over the objection of a secured creditors. *See In the Matter of Naugle's Nursery, Inc.*, 37 B.R. 574 (Bankr. S.D.Fla.1984) (confirmed a plan despite original notes which were to be paid over three to seven years were extended to fourteen years); *In re Benson*, 9 B.R. 854 (Bankr. N.D.Ill.1981) (court confirmed plan which extended a note payable in two years to twenty years).

Other courts have also found similar extensions fair and equitable where the secured creditor has been given the "indubitable equivalent" of its secured claim. For example, *In the Matter of James Wilson Associates*, 965 F.2d 160 (7th Cir.1992) allowed a creditor's loan extended seven years at a rate fixed by the court because the adequate security and the interest rate compensated the creditor for the opportunity cost of the money and risk of default. *Id.* at 172. *In re Dilts*, 126 B.R. 470 (Bankr.W.D.Pa.1991), concluded that a debtor's plan did not unfairly discriminate despite the fact that it not only extended an oversecured creditor's loan but reduced the interest rate as well. *Id.* at 472.

In a case relied upon by MONY, the bankruptcy court refused to confirm a plan which extended a five year note into a twenty year note where a contract which provided a substantial portion of Debtor's income was renewable on an annual basis. *See In re Manion*, 127 B.R. 887 (Bankr.N.D.Fla.1991). MONY asserts that the same situation exists with to the GHMA lease situation. Other than unsupported speculation, there is no evidence that GHMA's lease will not be renewed in four years without finding a suitable lessee replacement.

Under Debtor's Plan, MONY will retain its lien securing the Property. The Debtor has brought current all past interest only payments, has never defaulted on any past interest payments prior to July, 1992, the property has been 100% occupied since filing of the Chapter 11 petition. MONY will receive a future stream of deferred cash payments with a present value equal to the present value of its claim. Therefore, since the collateral in this case is real estate, extending MONY's loan is not unfairly discriminatory. MONY has been given the indubitable equivalent of its secured claim.

### b. *8% Rate of Interest*

■■■■ In this case, the bankruptcy court found that "an interest rate of 8% is an appropriate rate to be applied to MONY's claim based upon the testimony of Louis R. Trigg, and the holding in *In re Fowler*, 903 F.2d 694 (9th Cir.1990)." (DN 255 ¶ 3(c)) MONY argues that this is a below market rate of interest. *In re Fowler* recognized that there are two methods used for determining a market cramdown rate. *Id.* at 697. The bankruptcy court can use either a formula approach or determine the current market interest rate for similar loans in the region. *Id.* The market rate has been defined as the rate of interest on deferred secured claims to be the rate of interest the debtor would pay to borrow a similar amount on similar terms in a commercial loan market. *In re Camino Real Landscape Maintenance Contractors*, 818 F.2d at 1506.

■■■■ Louis Trigg testified through affidavit and deposition that he had inquired into loans in the region and was quoted interest rates from four lenders ranging from 7-⅜% to 8%. Also before the bankruptcy court was the affidavit, deposition and confirmation hearing testimony of Swain Chapman in addition to an exhibit indicating the current rates for payment on bond obligations by the United States Government. The bankruptcy court also had MONY's expert's affidavit as a comparison. A confirmation hearing was held and evidence taken by the bankruptcy court. "A bankruptcy court should be accorded substantial deference in these matters because it has 'almost daily experience with the rates charged by actual commercial lenders'" when it makes an interest rate decision. *Id.* at 1508. The evidence supports the finding by the bankruptcy court that the payment of interest to MONY at the rate of 8% per annum was a rate of interest a debtor

would pay to borrow a similar amount on similar terms in Tucson. Therefore, the Court finds no reversible error in the bankruptcy court's ruling.

### c. *Absolute Priority Rule*

■ Finally, MONY argues that Debtor's Plan is not fair and equitable because it violates the absolute priority rule. The bankruptcy court found that the Debtor's Plan satisfies the "new value" exception to the absolute priority rule and that the new capital to be contributed is not de minimis. (DN 255) MONY contends that the bankruptcy court erroneously applied a "de minimis" standard when the correct standard is "whether there is a genuine and fair exchange of new capital for an equity interest." *In re Bonner Mall Partnership*, 2 F.3d 899, 909 (9th Cir.1993). MONY also asserts that Debtor's Plan cannot be confirmed because the Debtor will retain an interest in the property while failing to pay MONY all of its attorney's fees and default interest. MONY also asserts that the Debtor has failed to make an adequate capitalization contribution to retain ownership of the property.

. The absolute priority rule requires that the holder of an *unsecured* claim must receive the full amount of its allowed claim unless all junior claims and interests will receive no property and retain no interest under the plan. 11 U.S.C. § 1129(b)(2)(B). MONY through the same counsel who is before the Court today, unsuccessfully attempted to raise this argument in *In re Paradise Springs Associates*, 165 B.R. 913 (Bankr. D.Ariz.1993). *Paradise Springs* held that because MONY had elected to treat its *unsecured* claim as *secured*, it lacked standing to raise the absolute priority rule. *Id.* at 920–21. MONY's secured claim status is not in question in this case. Appellants have standing only to challenge those parts of the plan that affects their direct interests. *In re Evans Products Co.*, 65 B.R. 870, 874 (S.D.Fla. 1986). Thus, MONY, as a secured creditor lacks standing to raise this objection.

### D. Whether the Debtor's Plan is a "full repayment plan" as to each class of claims under the Plan

In contrast to the bankruptcy court's finding, MONY asserts that the Debtor's Plan should not have been confirmed because it is not a full repayment plan. MONY argues that since the plan does not provide for attorneys' fees and default interest, it is not being paid all that it is entitled. This, of course, is not true. The reasonableness of MONY's attorneys' fees shall be determined by the bankruptcy court. Default interest has already been determined by this Court. *See* Section A.4., *supra.*

MONY also contends that the FDIC and the Sisters of Carondelet claims are not full repayment plans. The FDIC and the Sisters of Carondelet voted in favor of Debtor's Plan (DN 213); MONY has no standing to rely on an analysis of these two claims to bootstrap its position.

■ Moreover, the Debtor need not establish at confirmation that all of the proposed payments to creditors will, in fact, be received. The Debtor need only establish by a preponderance of the evidence that there is a reasonable probability that it can make the required payments pursuant to the terms of its Plan. *In re Consul Restaurant Corp.*, 146 B.R. 979 (Bankr.D.Minn.1992); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 762 (Bankr.S.D.N.Y.1992); 5 *Collier on Bankruptcy* § 1129.02(11) (15th ed. 1992). The bankruptcy court had sufficient evidence to conclude that this leasehold is a positive cash flow property adjacent to a major hospital. The evidence establishes that a reasonable probability exists that the payments to creditors proposed in Debtor's Plan will be made. Thus, the bankruptcy court's decision is not clearly erroneous.

### E. Whether the Bankruptcy Court erred in confirming Debtor's Plan without ruling on MONY's Motions to Strike portions of the affidavits of Debtor's witnesses

The bankruptcy court ordered the debtor's plan of reorganization confirmed and ruled "that the objections to such confirmation are overruled." (DN 256) MONY argues that

this is insufficient and that the bankruptcy court should have explicitly ruled on MONY's evidentiary objections to Louis Trigg's and Swain Chapman's affidavits.

The standard for adequacy of factual findings is whether they are explicit enough on the ultimate issues to give the appellate court a clear understanding of the basis of the decision and to enable the Court to determine the grounds under which the trial court reached its decision. *Louie v. U.S.*, 776 F.2d at 822–23; *In re Bradford*, 112 B.R. 347, 353 (9th Cir. BAP 1990). The bankruptcy's court December 15, 1993 order demonstrates that it was unpersuaded by MONY's objections including MONY's evidentiary objections. MONY's objections were either explicitly handled by the bankruptcy court's confirmation order or moot as a result of it.

For example, MONY argues that Louis Trigg's deposition testimony contained hearsay because Trigg admitted that it was the opinion of Debtor's attorney that the 8% market rate was appropriate. Since there was authority elsewhere to support the 8% figure, the Court did not commit reversible error when it did not explicitly rule on MONY's evidentiary objections.

### F. Whether the Debtor's Plan is preferable to MONY's Plan under § 1129(c).

 MONY has summarized its proposed Plan as follows:

> MONY's Plan provides for a two year period for marketing and sale of Debtor's leasehold interest in the St. Joseph's medical center. If a sale cannot be achieved within the two year period, MONY is given the right to foreclose its first position lien on the leasehold estate. Proceeds from the sale, foreclosure sale, or deed of trust sale of the leasehold estate will be paid to secured creditors in the order of priority of their liens. Additionally, administrative and priority creditors will be paid in full and noninsider unsecured creditors other than the ground lessor will be paid ninety percent (90%) of the allowed amount of their claims.

MONY's Opening Brief at 24–25. MONY recognizes that its Plan is comparable to a Chapter 7 liquidation. It reasons, however, that if this case were a Chapter 7 filing, no unsecured creditor would receive a 90% distribution, therefore, MONY's Plan satisfies the "best interests of the creditors" test.

Relying on *L & J Anaheim, supra*, MONY asserts that its Plan satisfies 1129(a)(1) because MONY, as an impaired class under the Plan, has voted in favor of its own plan. However, MONY must pass the second prong of the *L & J Anaheim* analysis, and that is whether MONY's Plan has been proposed in good faith. It cannot survive such scrutiny.

 MONY's Plan conspicuously violates the objectives and purposes of the Code. The protection of creditor's interests is important. In a Chapter 11 filing, however, "successful debtor reorganization and maximization of the value of the estate" are the primary purposes of the Bankruptcy Code. *Bonner Mall*, 2 F.3d at 916. Moreover, "Chapter 11 is designed to avoid liquidations under Chapter 7, since liquidations may have a negative impact on jobs, suppliers of the business, and the economy as a whole." *Id.*

MONY is a secured creditor which has been receiving and will continue to receive full payment of its debt. It is not, however, the only creditor. The estate consists of other creditors whose claims are partially secured and partially unsecured. Under MONY's proposed plan, if foreclosure were to occur in two years all other creditors would be prejudiced. For example, if the property cannot be sold and MONY forecloses on the collateral, two classes of creditors, the ground lessor and the FDIC would receive nothing for their claims if they did not have the money to bid over and above what their claim is to satisfy MONY's lien. This was an obvious concern of the bankruptcy court when it questioned MONY on this very scenario at the Confirmation Hearing. (DN 241 at 12–13) Debtor's Plan is preferred by all of the creditors with the exception of MONY. The evidence thus establish-

es that MONY's Plan, at a minimum, violates the best interests of the creditors test and the primary purpose behind the Bankruptcy Code. This Court can find no error in the bankruptcy court's finding that the Debtor's Plan was preferable to MONY's proposed plan.

## VI. CONCLUSION

The record reflects that a substantial basis exists for the bankruptcy court's decision and this Court will not reverse it. The bankruptcy court's finding that the Plan is feasible is not clearly erroneous and does not constitute an abuse of discretion.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Order of the bankruptcy judge confirming the Patrician St. Joseph Limited Partnership's Plan of Reorganization is **AFFIRMED**. This appeal is hereby **DISMISSED**.