**S & P, INC., Plaintiff–Appellant,**

v.

**Daniel H. PFEIFER and Sweeney, Pfeifer & Blackburn, Defendants– Appellees.**

**No. 3:95cv266 AS.**

United States District Court, N.D. Indiana, South Bend Division.

Oct. 3, 1995.

Patrick D. Murphy, Barnes and Thornburg, South Bend, IN, Mark J. Phillipoff, Jones Obenchain Ford Pankow and Lewis, South Bend, IN, for plaintiff-appellant.

Don G. Blackmond, John C. Hamilton, Doran Blackmond Ready Hamilton and Williams, South Bend, IN, for defendants-appellees.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

Plaintiff–Appellant S & P, Inc. ("S & P") appeals from a final judgment of the United States Bankruptcy Court awarding damages of $14,391 to S & P. S & P challenges the bankruptcy court's finding that S & P's reorganization as an ongoing concern would not have been possible, and asserts that (a) the bankruptcy court exceeded the Seventh Circuit's mandate on remand; and (b) S & P's original damages calculations were and are accurate. This court has jurisdiction over S & P's bankruptcy appeal pursuant to 28 U.S.C. § 158(a).

## I. BACKGROUND

### A. Procedural History

In March 1988, S & P brought a malpractice suit against its attorney, Daniel H. Pfeifer, and his law firm, Sweeney, Pfeifer & Blackburn, who were representing S & P in Chapter 11 proceedings. The suit alleged that S & P was evicted without notice from its leased premises and forced to close and liquidate its restaurant business as a result of the attorney's misconduct. On October 21, 1992, the United States Bankruptcy Court for the Northern District of Indiana, Robert K. Rodibaugh, Judge, found that the attorney and his firm had committed professional malpractice and awarded money damages of $14,391, including $11,000 in actual damages and prejudgment interest in the amount of $3391.

S & P filed a motion to amend the bankruptcy court's findings and judgment, alleging that erroneous findings of fact had led the court to incorrectly conclude that a successful reorganization of S & P pursuant to 11 U.S.C. § 1129 would not have been possible. The bankruptcy court denied S & P's motion, and S & P appealed to the United States District Court for the Northern District of Indiana. The district court affirmed the decision of the bankruptcy court, and S & P subsequently appealed to the United States Court of Appeals for the Seventh Circuit. In an unpublished order dated May 6, 1994, the Court of Appeals reversed the bankruptcy court's decision, finding two of the court's determinations on the issue of damages to be clearly erroneous. The Seventh Circuit remanded the case to the bankruptcy court to determine whether reorganization of S & P would have been possible,

and whether S & P's damages calculations were accurate.

On remand, the bankruptcy court found that, under either of two different scenarios, reorganization of S & P would have been impossible, and therefore concluded that the original damages of $14,391 awarded to S & P in the court's original order were correct and proper. Bankr.Ord. (Feb. 24, 1995) at 28. S & P appeals to this court on the grounds that (a) the bankruptcy court exceeded the Seventh Circuit's mandate on remand; (b) S & P's reorganization would have been possible; and (c) S & P's damages calculations were and are accurate. This court heard oral argument on August 24, 1995.

### B. Facts

Plaintiff–Appellant S & P formerly did business as the Big Bear Restaurant (the "Big Bear") in Mishawaka, Indiana. S & P was incorporated under the laws of Indiana on January 12, 1978. In 1986, S & P opened another restaurant in Elkhart, Indiana, called Chef Willie's, which proved to be unsuccessful and closed within a year. Although the Big Bear Restaurant allegedly continued to be a profitable business,[1] S & P found itself in financial straits by 1987 due to liability for past-due withholding and FICA taxes from the failed Chef Willie's venture, as well as a rent dispute with the lessor of the property on which the Big Bear was operated.[2] In early 1987, S & P hired attorney Daniel H. Pfeifer and his law firm, Sweeney, Pfeifer & Blackburn, to represent the company's interests in various legal matters. In August of that year, S & P, unable to resolve its financial difficulties, authorized Mr. Pfeifer to file a petition for relief on its behalf under Chapter 11 of the Bankruptcy Code (the "Code").

S & P alleges that it intended to use future profits generated by the Big Bear Restaurant to satisfy its pre-petition obligations. However, Mr. Pfeifer failed to advise S & P that pursuant to § 365 of the Code, the company's unexpired, ten-year commercial lease would terminate as a matter of law unless S & P filed a motion to assume the lease within sixty days of the order of relief. Under § 365, if a debtor fails to assume or reject the lease within sixty days, or to petition the court for an extension of time, the debtor must immediately surrender the property upon order of the bankruptcy court.

As a result of Pfeifer's failure to advise S & P of this requirement or to seek the bankruptcy court's authorization to assume the lease, S & P was required to surrender the restaurant property. Having failed to assume the lease, S & P also lost its option to renew the lease in January of 1988. After the bankruptcy court entered an order directing immediate surrender, the property owner gave S & P five days to vacate the premises, thereby forcing S & P to cease operation of the Big Bear and liquidate its inventory. S & P subsequently retained new counsel and filed its malpractice suit against Pfeifer and his law firm, Sweeney, Pfeifer & Blackburn.

After trial, the bankruptcy court determined that Pfeifer had breached his professional duty to S & P by failing to exercise ordinary care, skill, and diligence under the circumstances. Specifically, the court found "a surfeit of evidence that [Pfeifer and his law firm] failed to follow proper procedures or adequately advise their client concerning the bankruptcy proceeding." Bankr.Ord. (Oct. 21, 1992) at 16.

The bankruptcy court stated that the true measure of damages was the value of the Big

---

1. Defendants–Appellees Pfeifer and Sweeney, Pfeifer & Blackburn contend that contrary to S & P's statements, the Big Bear Restaurant was not "sunk" by the failure of Chef Willie's, but rather by its own financial difficulties. Defendants–Appellees' Brief at 20. William L. Wilson, a certified public accountant who testified on behalf of the defendants-appellees, "observed that at no time was there a clear indication that the restaurant was making substantial profits. In fact, the restaurant's financial picture substantially worsened in 1986 when it suffered a loss in

the amount of $40,418." Bankr.Ord. (Feb. 24, 1995) at 11.

2. Ultimately, the landlord filed a state court complaint on July 24, 1987, seeking possession of the leased property and payment of delinquent rent. S & P's filing of its petition for relief under 11 U.S.C. § 362 automatically stayed the state court eviction proceeding. Bankr.Ord. (Oct. 21, 1992) at 5.

Bear Restaurant as an ongoing reorganized business. *Id.* at 17. In calculating damages, the court focused on the five-month period from September 1, 1987, to January 31, 1988, during which S & P operated the Big Bear as debtor-in-possession. *Id.* at 21–23. Because the bankruptcy court concluded that S & P did not sustain its burden of proving that there was a reasonable possibility of a successful reorganization for S & P to lose, *id.* at 16, the court awarded no damages for the loss of the restaurant itself, but instead awarded damages only for the value of Pfeifer's retainer ($5000), the cost of lost inventory ($2000) given away during S & P's hasty eviction from the premises, and the value of new menus ($4000) ordered shortly before S & P was forced to close the Big Bear. *Id.* at 25–26. The bankruptcy court also awarded pre- and postjudgment interest. *Id.* at 27–28.

On appeal from the district court's affirmance of the bankruptcy court decision, the Court of Appeals for the Seventh Circuit concluded that two of the bankruptcy court's original findings were clearly erroneous. First, the Court of Appeals found that the bankruptcy court had incorrectly used the figure for cash on hand at the beginning of January 1988 as the amount on hand as of January 31, 1988. *In re S & P, Inc.,* No. 93–3066, 1994 WL 175415 (7th Cir. May 6, 1994) (remand order) at 4. The bankruptcy court's use of the wrong figure for cash on hand at the end of January effectively reduced the amount of cash S & P had accumulated from September 1, 1987, to January 31, 1988.

Second, the Court of Appeals concluded that the bankruptcy court had erred by using the wrong monthly rent figure in its damages calculations. Notwithstanding that S & P's lease agreement provided for percentage rent over and above the base rate used by the bankruptcy court, and despite the fact that defense exhibits—upon which the bankruptcy court had relied for its cash on hand and total cash receipts figures—clearly showed that S & P was paying between $5047.40 and $5113.72 per month, the bankruptcy court nonetheless had determined that there was insufficient evidence to support a finding that S & P was paying more

than $2200 base rate in building rent during the relevant five-month debtor-in-possession period. The Court of Appeals found that it was clear error for the bankruptcy court to disregard the figures for monthly building rent paid. *Id.* at 5.

The Seventh Circuit reversed the bankruptcy court's original decision and remanded the case to the bankruptcy court "for reconsideration of damages." *Id.* at 6. Specifically, the Court of Appeals remanded the case with the following instructions:

> We leave it to the bankruptcy court to determine on remand whether reorganization would have been possible and whether S & P's damages calculations are accurate, using the proper figures for the cash on hand on January 31, 1988, and the correct amount of rent paid. Should the court determine that reorganization would have been possible, we agree with the bankruptcy court that S & P should be awarded damages equal to the value of the Big Bear Restaurant.

*Id.* at 5–6. On remand, the bankruptcy court, using figures found by the Court of Appeals to be proper for the cash on hand on January 31, 1988, and the amount of rent paid, again determined that reorganization of S & P would not have been possible. Bankr. Ord. (Feb. 24, 1995) at 17–18. This time, however, instead of returning to its original calculation using the five-month debtor-in-possession period as a basis for determining damages, the bankruptcy court focused on an earlier period of S & P's operation (1983–85) in its damages calculations. *Id.* at 20. In its order on remand, the bankruptcy court concluded that reorganization would have been impossible and found that the damages of $14,391 awarded to S & P in its earlier order of October 21, 1992, were correct and proper. *Id.* at 28.

## II. DISCUSSION

### A. Standard of Review

█ A district court sitting as an appellate tribunal pursuant to 28 U.S.C. § 158(a) must accept a bankruptcy court's factual findings unless they are clearly erroneous. Fed.R.Bankr.P.Rule 8013, 11 U.S.C.; *see In re Sheridan,* 57 F.3d 627, 633 (7th Cir.1995);

*In re Newman,* 903 F.2d 1150, 1152 (7th Cir.1990); *Calder v. Camp Grove State Bank,* 892 F.2d 629, 631 (7th Cir.1990). Mixed questions of fact and law are similarly reviewed under the "clearly erroneous" standard. *Schiro v. Clark,* 963 F.2d 962, 974 (7th Cir.1992), *aff'd,* —— U.S. ——, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994); *United States v. Levy,* 955 F.2d 1098, 1103 n. 5 (7th Cir.), *cert. denied,* 506 U.S. 833, 113 S.Ct. 102, 121 L.Ed.2d 62 (1992). A bankruptcy court's conclusions of law, however, are subject to *de novo* review by the district court. *In re Sheridan,* 57 F.3d at 633; *In re Newman,* 903 F.2d at 1152; *Calder,* 892 F.2d at 631; *In re Longardner & Assocs., Inc.,* 855 F.2d 455, 459 (7th Cir.1988), *cert. denied,* 489 U.S. 1015, 109 S.Ct. 1130, 103 L.Ed.2d 191 (1989).

■ In the instant case, the issues presented on appeal include examples of each type of question. The issue of whether S & P's damages calculations are accurate is a finding of fact reviewable under the clearly erroneous standard. The bankruptcy court's determination that reorganization of S & P would have been impossible is a mixed question of fact and law: S & P contends that it was the bankruptcy court's reliance on a flawed damages calculation that led the court to determine that a successful reorganization would not have been possible. This determination is likewise reviewable only for clear error. The issue of whether the bankruptcy court exceeded the mandate of the Seventh Circuit on remand, however, is a question of law and thus is subject to *de novo* review by this court.

■ Because the question of whether the bankruptcy court exceeded the mandate of the Court of Appeals on remand would be conclusive for purposes of the present appeal if answered in the affirmative—findings of fact and mixed questions of fact and law determined in violation of the Seventh Circuit's mandate automatically would be presumptively invalid—this court must first decide whether the bankruptcy court, by altering its original formula for damages calculations, deviated from the law of the case as determined by the Court of Appeals.

**B. The Law of the Case**

■ S & P claims that the Seventh Circuit's order, by instructing the bankruptcy court on remand "to determine 'whether S & P's damages calculations are accurate, using the proper figures[,]' ... can only be read as an implicit approval of the damages formula originally adopted and used by the Bankruptcy Court." Plaintiff–Appellant's Brief at 23. In S & P's view, the bankruptcy court, by "completely discard[ing] its original formula, adopt[ing] a new formula, and retr[ying] every issue related to damages[,] ... violated the Seventh Circuit's clear mandate." Plaintiff–Appellant's Reply Brief at 2. S & P is apparently willing to concede, however, that the bankruptcy court may *not* have violated the *"letter"* of the mandate, on the basis of its statement that, "[a]t the very least, the Bankruptcy Court has violated the 'spirit' of the Seventh Circuit's mandate." *Id.*

■ The Seventh Circuit has summarized the "law of the case" doctrine in the context of a case remanded to a lower tribunal by an appellate court. In *Key v. Sullivan,* 925 F.2d 1056 (7th Cir.1991), the Court of Appeals stated:

> The gist of the doctrine is that once an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case.... Like most rules, the law of the case has its exceptions. Previously decided determinations are not applied if there are reasons rendering the doctrine inapplicable.... The doctrine most often applies to issues already fully decided in cases that subsequently re-appear before the rendering court. If an issue is left open after remand, the lower tribunal is free to decide it.

*Id.* at 1060 (citations omitted).

While *Key* involved an appellate remand to an administrative agency, the above discussion is consistent with other Seventh Circuit decisions involving an appellate reversal and remand to a trial court. In *United States v. Polland,* 56 F.3d 776 (7th Cir.1995), the Seventh Circuit stated that "[t]he law of the case doctrine ... prohibits a lower court from reconsidering on remand an issue expressly

or impliedly decided by a higher court absent certain circumstances." *Id.* at 779. In *Holcomb v. United States*, 622 F.2d 937 (7th Cir.1980), the Court of Appeals noted that "[w]hile an appellate decision establishes the 'law of the case' for all subsequent stages of the litigation, the trial court is restrained only with respect to those issues which have been considered and resolved by the appellate court." *Id.* at 940 (citation omitted). Thus, a trial court is not bound by its own earlier rulings unless they have been either explicitly or implicitly adopted by the appellate court's decision. *Exxon Corp. v. United States*, 931 F.2d 874, 877 (Fed.Cir.1991).

In the instant case, the Court of Appeals never *explicitly* approved the bankruptcy court's formula for damages calculation—its order simply noted that, "[i]n calculating damages, [the bankruptcy court] focused on September 1, 1987 to January 31, 1988, the five-month period that S & P operated the Big Bear as debtor-in-possession." *In re S & P, Inc.*, No. 93–3066, 1994 WL 175415 (7th Cir. May 6, 1994) (remand order) at 2. Additionally, the Court of Appeals stated that "[S & P] accepts ... that, in calculating damages, the proper focus should be on the five-month period that S & P operated as debtor-in-possession; and that the court followed a proper methodology in calculating damages." *Id.* Neither statement constitutes an explicit adoption of the bankruptcy court's original formula. Thus, the question is whether the Seventh Circuit's opinion *by necessary implication* adopted the bankruptcy court's formula for damages calculations.

 In order to determine whether the Court of Appeals intended—as S & P asserts—that the bankruptcy court simply "insert[ ] the correct numbers into its original damages formula and then determin[e] whether S & P's damages calculations were accurate and whether reorganization was possible," Plaintiff–Appellant's Brief at 23, it is necessary to consider the scope of the Seventh Circuit's mandate to the bankruptcy

court on remand. The so-called "mandate rule," of which the law of the case doctrine is a corollary, *Polland,* 56 F.3d at 779, "simply embodies the proposition that 'a [trial] court is not free to deviate from the appellate court's mandate.'" *Barber v. International Brotherhood of Boilermakers*, 841 F.2d 1067, 1070 (11th Cir.1988) (quoting *Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 n. 2 (11th Cir.1984) (alteration added)); *see also Sibbald v. United States*, 37 U.S. (12 Pet.) 488, 492, 9 L.Ed. 1167 (1838) ("Whatever was before the court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case, and must carry it into execution, according to the mandate."). "[T]he application of these mandate rule principles will ... depend considerably ... on the language of the appellate court's mandate and/or opinion." *Barber,* 841 F.2d at 1071; *see also Wheeler,* 746 F.2d at 1440 n. 2 ("To determine the scope of the mandate, it is appropriate, indeed often necessary, to look to the court of appeals' opinion.").

 As with all applications of the law of the case doctrine, the mandate of an appellate court on remand constitutes the law of the case only on those issues of law that were actually considered and decided by the appellate court, or necessarily to be inferred from the appellate court's disposition of the case on appeal. *Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979). Pursuant to 28 U.S.C. § 2106, the circuit courts of appeals may issue either general or limited remands to the lower courts.[3] *United States v. Young,* 66 F.3d 830, 835–36 (7th Cir.1995). The mandate to the bankruptcy court in the instant case stated: "For the reasons stated above, the bankruptcy court's decision must be reversed and the case remanded *for reconsideration of damages." In re S & P, Inc.,* No. 93–3066, 1994 WL 175415 (7th Cir. May 6, 1994) (remand order) at 6 (emphasis

---

3. Section 2106 states:
 The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct

the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.
28 U.S.C. § 2106 (1993).

added). From this mandate, an inferior court might reasonably infer that the Court of Appeals' opinion forecloses a reexamination of the issue of liability on remand. At the same time, a reading of the Seventh Circuit's opinion leads inexorably to the conclusion that the Court of Appeals did not intend to *limit* the bankruptcy court's "reconsideration of damages" to a simple, mechanical 'plugging in' of the numbers as S & P suggests.[4]

As noted previously, the Court of Appeals gave specific instructions for the bankruptcy court "to determine ... whether reorganization would have been possible and whether S & P's damages calculations are accurate." *Id.* at 5. By its very words, the remand instruction permits the bankruptcy court some degree of latitude to determine the *accuracy* of the plaintiff-appellant's calculations. Thus, the fact that the Court of Appeals found the bankruptcy court had erred in two of the figures used in its original calculation *does not in itself imply that the Seventh Circuit was convinced of the validity of the bankruptcy court's original methodology.* If the Court of Appeals had been persuaded of the validity of the bankruptcy court's formula for damages calculations (which the bankruptcy court adopted from S & P), it would have had no reason to instruct the bankruptcy court to determine the accuracy of S & P's calculations on remand. Instead, the Seventh Circuit remanded the case to the bankruptcy court for *reconsideration* of damages.

■■■ In addition, the methodology used by the bankruptcy court was not essential to the Seventh Circuit's finding of clear error in the figures the bankruptcy court used for cash on hand as of January 31, 1988, or for monthly rent paid. Regardless of whether the bankruptcy court bases its decision on a mathematical extrapolation of the five-month

debtor-in-possession period (as in its first order), or focuses on an earlier period from 1983 through 1985 (as in its order on remand), "giv[ing] little weight to the figures from the years 1986 through 1988," Bankr. Ord. (Feb. 24, 1995) at 20, the fact remains that the figures corrected by the Seventh Circuit constituted clear error by the bankruptcy court, and thus could not be used as a basis for a final determination of S & P's damages. That these figures were clearly erroneous does not in itself mandate a finding that the Court of Appeals adopted the original formula in which they were used.

Because the mandate of the Court of Appeals did not by necessary implication approve the bankruptcy court's formula for damages calculations, S & P's argument that the bankruptcy court violated the Seventh Circuit's mandate must fail. Thus, the bankruptcy court was free on remand, using the proper figures, to reconsider the evidence in determining (a) whether S & P could possibly have reorganized; and (b) the accuracy of S & P's damages calculations. "A judge may reexamine his earlier ruling ... if he has a conviction at once strong and reasonable that the earlier ruling was wrong, and if rescinding it would not cause undue harm to the party that had benefited from it." *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1227 (7th Cir.1995) (citing *Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n. 8, 75 L.Ed.2d 318 (1983)).

In the instant case, the bankruptcy court's order on remand states that, because it became "skeptical as to whether or not the [original] formula ... in fact represents the most accurate future financial picture for the Big Bear Restaurant," Bankr.Ord. (Feb. 24, 1995) at 19, the court chose to consider "figures which represent an annual overview of the operations of the Big Bear Restaurant"

---

4. Apparently, defendants-appellees argued on remand that "[h]ad the Court of Appeals intended that this court simply plug in the new figures ... as S & P suggests, the appellate court would have performed this *de minimis* task itself, instead of remanding this case for further consideration." Bankr.Ord. (Feb. 24, 1995) at 10. While this court agrees that the Court of Appeals intended to provide the bankruptcy court with some latitude in its methodology for determining

whether reorganization was possible, the fact that a simple, 'plugging in' of the correct figures is a *de minimis* exercise is not proof in itself that the Court of Appeals remanded the case for more. Appellate courts often remand for resolution of narrow factual issues. *See, e.g., Baumer v. United States,* 685 F.2d 1318, 1321 (11th Cir. 1988) (remanding for determination of option's fair market value when exercised).

in order to determine whether reorganization would have been possible. *Id.* at 20. The parties that had benefited from the bankruptcy court's prior damages calculation—Pfiefer and his firm, Sweeney, Pfeifer & Blackburn—were not caused undue harm by the bankruptcy court's decision to reconsider trial testimony. Therefore, this court finds that the bankruptcy court was entitled to reconsider its method of calculating damages on remand.

## C. Possibility of Reorganization

Having decided that the bankruptcy court had committed clear error in two of the figures used in its calculations, the Seventh Circuit declined further review of the lower court's holding. After discussing S & P's allegations as to the effect of the aforementioned errors,[5] the Court of Appeals remanded the case to the bankruptcy court with instructions "to determine ... whether reorganization would have been possible." *In re S & P, Inc.*, No. 93–3066, 1994 WL 175415 (7th Cir. May 6, 1994) (remand order) at 5. Due to the loss of S & P's lease, of course, no plan for reorganization supported by a disclosure statement was ever submitted for confirmation pursuant to § 1129 of the Code. Bankr.Ord. (Feb. 24, 1995) at 17. Thus, in determining whether S & P's reorganization was possible, the bankruptcy court was obliged to analyze S & P's viability on the basis of the evidence presented at the malpractice trial.

Although the Seventh Circuit's remand order couched the issue in terms of whether reorganization would have been "possible," this court will assume for purposes of analysis that the test for whether reorganization would have been "possible" (*i.e.*, where no plan has been submitted) is analogous to the "feasibility" standard employed where a plan has actually been submitted for confirmation. Notwithstanding that the word "feasible" no longer appears in the Code's requirements for reorganization—the term is a vestige of the former § 366 of the Bankruptcy Act—the concept remains in the current Chapter 11. Section 1129(a)(11) of the Bankruptcy Code sets forth the so-called "feasibility" requirement for proposed reorganization plans, and provides that a plan may be confirmed only if it "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11) (1993).

Courts have interpreted Chapter 11's feasibility standard to be "firmly rooted in predictions based on objective fact." *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985). "[T]he feasibility standard is whether the plan offers a reasonable assurance of success." *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir.1988); *see also In re Briscoe Enters., Ltd.*, 994 F.2d 1160, 1166 (5th Cir.) ("Only a reasonable assurance of commercial viability is required.") (citation omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993); *In re Patrician St. Joseph Partners,* 169 B.R. 669, 674 (D.Ariz.1994) ("A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable.") (citing 5 Collier on Bankruptcy § 1129.02[11] (15th ed. 1992)).

Thus, "[t]he prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required." *In re Patrician St. Joseph Partners,* 169 B.R. at 674; *see also Kane,* 843 F.2d at 649 ("Success need not be guaranteed."); *In re Monnier Bros.,* 755 F.2d 1336, 1341 (8th Cir.1985); *In re IPC Atlanta Limited Partnership,* 142 B.R. 547, 559 (Bankr.N.D.Ga.1992). Because "[t]he test is whether the things which are to be done after confirmation can be done as a practical matter under the facts," *In re Bergman,* 585 F.2d 1171, 1179 (2d Cir.1978), "[t]he mere potential for failure of the plan is

---

5. The Seventh Circuit's remand order noted:
 S & P alleges that had the [bankruptcy] court employed the proper figures in determining damages it would have found that S & P would have a net income of $169,569.60 over the five-year period. S & P maintains that this amount would be sufficient both to pay off S & P's secured and priority creditor's claims ... and to produce a confirmable plan of reorganization. *In re S & P, Inc.,* No. 93–3066, 1994 WL 175415 (7th Cir. May 6, 1994) (remand order) at 5 (alteration added).

insufficient to disprove feasibility." *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 762 (Bankr.S.D.N.Y.1992). In essence, "Section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." *In re SM 104 Ltd.*, 160 B.R. 202, 234 (S.D.Fla.1993). Accordingly, a court reviewing a proposed plan for reorganization must examine "the totality of the circumstances" in order to determine whether the plan fulfills the requirements of § 1129(a)(11). *In re Mulberry Phosphates, Inc.*, 149 B.R. 702, 708 (Bankr.M.D.Fla.1993).

In the instant case, S & P contends that if the bankruptcy court had plotted S & P's calculation of the additional average monthly rent ($998.36), after assumption of the commercial lease, against the average net monthly income ($3824.16) derived from the five-month debtor-in-possession period, and then extrapolated the resulting net monthly income of $2825.80 to the five-year reorganization period, the court would have found "that S & P would have generated income of $169,-548 during the reorganization period." Plaintiff–Appellant's Brief at 15–17. From S & P's perspective, this level of income would have been more than sufficient to absorb the increased rent expense and the existing secured and priority claims against the company, and "would have resulted in a confirmable plan of reorganization." *Id.* at 17–18.

Although the bankruptcy court acknowledged on remand that applying the corrected figures for cash on hand and monthly rent paid to the original formula might indeed yield a hypothetical income of $169,548 over the five-year reorganization period, Bankr. Ord. (Feb. 24, 1995) at 17, the court concluded that S & P's reorganization would nonetheless have been impossible. *Id.* at 17–18. After reconsidering the trial testimony of the certified public accountants who testified on behalf of each side, the court concluded that in order to gain the most reliable insight into whether S & P could have successfully reorganized, "most weight must be given to figures which represent an annual overview of the operations of the Big Bear Restaurant." *Id.* at 20. In the bankruptcy court's view,

the five-month debtor-in-possession period from September 1, 1987, through January 31, 1988, reflected "only seasonal operations." *Id.* Thus, it chose to focus primarily on the statements of operations provided for the years 1983 through 1985. *Id.* at 21. The bankruptcy court concluded from the totality of the circumstances (*i.e.*, the evidence presented at trial) that reorganization of S & P was not possible—regardless of whether the court focused on the debtor-in-possession period or the earlier years of 1983 through 1985.

While the bankruptcy court states that it became "skeptical as to whether or not the formula suggested by [S & P] in fact represents the most accurate future financial picture for the Big Bear Restaurant," *id.* at 19, S & P contends that the court's use of financial statements from the years 1983 through 1985 presented a far less accurate picture by "focus[ing] on S & P's performance *several years prior to defendants' malpractice and resulting damages.*" Plaintiff–Appellant's Brief at 23 (emphasis in original). In S & P's view, the court erred in failing to "adjust[ ] for inflation or analyz[e] how the Big Bear Restaurant was operating in recent months as opposed to years earlier." *Id.* The decision as to which is the appropriate time frame for analyzing S & P's viability is a mixed question of fact and law which is left to the discretion of the bankruptcy court and will not be disturbed unless the court's decision is clearly erroneous. " 'A [bankruptcy court's] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)); *see also In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995); *In re Kenneth Leventhal & Co.*, 19 F.3d 1174, 1177 (7th Cir.1994). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511.

The bankruptcy court's reasoning for giving the most weight to earlier years of operation does not leave this court with a definite and firm conviction that a mistake has been committed. Provided that S & P's operations at the earlier time were not dramatically different in form and volume than such operations would have been during reorganization, a projection based on three years' worth of financial statements may indeed give a better overview of the business than does a projection which relies on but five months of operation. Consequently, because there are (at least) two permissible views of the evidence as to the proper time frame to be used in determining whether reorganization was possible, this court is not entitled to reverse the bankruptcy court's decision "even [if it were] convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.*

This court confesses that it is bemused by the parties' various arguments for or against the use of a particular time frame for the reorganization analysis. S & P first contends in its brief that the bankruptcy court erred by relying on statements of the company's performance in the years prior to the defendants' malpractice and the resulting damages. Plaintiff–Appellant's Brief at 23. Then, in attempting to obviate the distinction between "seasonal" and "annual" operations adopted by the bankruptcy court, S & P asserts that "sales figures during the five-month reorganization period were consistent with annual sales figures for prior years." *Id.* at 24 n. 5. If sales figures truly were consistent, and monthly rental expense were actually lower during the years of 1983 through 1985, how is the company harmed by the use of the earlier period of operation for the bankruptcy court's projection of S & P's viability?

On the other hand, Pfiefer and his law firm—through the trial testimony of their certified public accountant—contend that for purposes of determining the possibility of reorganization, the five-month debtor-in-possession period is not a good predictor of future operations during reorganization because "the period covered was unique in the history of the business since it was then operating under the protection of the Bankruptcy Code." Defendants–Appellees' Brief at 12. This argument has little persuasive power. Both periods of operation would fall under the protection of the Bankruptcy Code; therefore, it is conceivable that the five-month debtor-in-possession period would offer a representative view of how the business would actually operate during the five-year reorganization period.[6] Thus, in light of the apparent inconsistencies in the arguments of both S & P and Pfeifer regarding the proper time frame for analyzing the possibility of reorganization, this court is quite comfortable relying on the bankruptcy court's justification of preferring statements of annual rather than seasonal operations.

In calculating the disposable income S & P might have accumulated during the five-year reorganization period, the bankruptcy court first determined the average monthly profit by averaging total sales for 1983 through 1985; next, the court averaged the figures provided in the adjusted schedule of operations[7] to find that S & P's average monthly profit would have been $2107.28. Bankr.Ord. (Feb. 24, 1995) at 21. The court then calculated the average monthly rent S & P would have paid during reorganization by averaging the amount of rent paid during the years 1983 through 1985 and factoring in the additional rent S & P would have been required to pay under the renewed lease. These figures resulted in a disposable monthly income of $1567.61, or $18,811.32 per year.

---

6. Of course, this perspective would not be favorable to Pfiefer's interests: because S & P did not incur the sort of administrative expenses during the debtor-in-possession period that it might have incurred following confirmation of its theoretical reorganization plan, reorganization might have appeared possible using the debtor-in-possession period as a basis for analysis.

7. The adjusted schedule of operations made allowances for "payments on debts for which S & P would not be responsible while operating as a debtor-in-possession." Bankr.Ord. (Feb. 24, 1995) at 20–21. At the same time, the bankruptcy court took into consideration debts that had been incurred during the earlier period of operations "which S & P would have had to incur again if its plan of reorganization were to succeed." *Id.* at 21.

*Id.* During the five-year reorganization period, then, the bankruptcy court found that S & P would have generated $94,056.60 in disposable income. *Id.* at 22.

After performing the basic calculation of disposable income, the court delved into the repayment of creditors' claims, correctly noting that the Bankruptcy Code implicitly requires a bankruptcy court to preserve the interests of both creditors with impaired claims and those with secured claims by calculating "the present value of the plan's stream of payments." *Id.* Specifically, § 1129 requires that a plan provide the holder of an impaired claim with an amount "as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Code]." 11 U.S.C. § 1129(a)(7)(A)(ii) (1993). In addition, § 1129 provides that the holder of a secured claim must "receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(II) (1993).

The bankruptcy court determined that S & P would have owed secured and priority claims totaling at least $68,711.38 (and perhaps as much as $71,893.38) at the time a plan for reorganization would have been submitted. Bankr.Ord. (Feb. 24, 1995) at 26. Because it found that S & P would have had insufficient funds to pay both the priority tax claims and the secured claims at the time such a plan would have been confirmed, the court concluded that S & P would have had to defer the claims and pay interest over the five-year reorganization period, "so that the claim holders would receive the value of their claims as of the effective date of the plan." *Id.* at 27. In addition to the encumbrance of paying interest expense on deferred claims, S & P might well have incurred priority claims and administrative expenses during the life of the plan—payments not included in the court's calculations. *Id.* The bankruptcy court concluded that "the added amount of interest that S & P would have been required to pay for deferring payment on the secured claims and the tax priority claims as well as the future administrative costs that S & P would have been required to bear *alone* would have made reorganization impossible." *Id.* at 27–28 (emphasis added).

In addition to the unfavorable (to S & P) results of its calculation of future disposable income, the bankruptcy court highlighted several other factors which compelled its decision. First, the court noted that its earlier decision that reorganization was impossible "did not rest solely on evaluating the financial condition of the Big Bear Restaurant while it was in operation from September 1, 1987, to January 31, 1988," but also rested upon "careful consideration" of the testimony of expert witnesses. *Id.* at 16. The bankruptcy court pointed out that from the outset, S & P's "lack of books and records" increased the company's burden of "proving that it could have submitted a feasible plan of reorganization" pursuant to § 1129. *Id.* at 17. The court also found that S & P's financial base was unsound, noting that "[a]t the time S & P filed for bankruptcy, the Big Bear Restaurant's liabilities far exceeded its assets." *Id.* at 18.

Finally, the court relied on the testimony of the defendants-appellees' certified public accountant, who concluded that "S & P's lack of significant assets posed a major problem, because if S & P were going to reorganize successfully, it needed readily accessible assets which it could sell in an effort to aid in reorganization." *Id.* at 18–19. Additionally, the bankruptcy court stated that it would have been impossible for S & P to have submitted a feasible plan of reorganization for another reason:

[B]ecause of the high volume of company creditors and the fluctuating profitability of the restaurant, S & P would not have been able to receive financing for new equipment if needed, either from a new creditor or an old creditor. Since all of S & P's profits from the Big Bear Restaurant would have been needed to pay off company creditors, the restaurant would have been unable to purchase new equipment if needed to keep the Big Bear Restaurant in operation. Therefore, any significant problems with equipment could

have caused the restaurant to close, forcing S & P from a reorganization plan into a liquidating plan.

*Id.* at 19.

S & P complains that in calculating the additional monthly rent expense S & P would have incurred under its renewed commercial lease, the bankruptcy court made the same error it made in its original decision. Plaintiff–Appellant's Brief at 25–26; *see* Plaintiff–Appellant's Reply Brief at 6. In making its allegation, the plaintiff-appellant cites to page four of the bankruptcy court's opinion on remand. Brief at 25; *see* Reply Brief at 6–7. This court finds no basis in fact for S & P's contention. To the contrary, this court understands the bankruptcy court to be engaged in a discussion of the historical background of the instant case at page four of that court's order. *See* Bankr.Ord. (Feb. 24, 1995) at 2–6. Counsel for the plaintiff-appellant is advised to read closely the bankruptcy court's discussion of additional monthly rent expense at page 21 of that court's order for a proper understanding of the calculation. S & P's claim that the bankruptcy court replicated its original error on remand is without merit.

Additionally, S & P takes issue with the bankruptcy order on two other related points. First, S & P claims that the bankruptcy court's statements that the Big Bear Restaurant did not have a sound financial base, and that its "liabilities far exceeded its assets," "show a complete misunderstanding of the facts." Plaintiff–Appellant's Brief at 26. In fact, as the defendants-appellees correctly note in their brief, there is ample room to question the viability of the Big Bear Restaurant as an individual entity prior to the time when S & P retained Pfeifer to represent the company in various legal matters. *See* Exhibit B, Schedules I & II; Defendants–Appellees' Brief at 20. S & P hired Pfeifer and his law firm not only to handle negotiations as to the company's past-due withholding and FICA taxes from the failed Chef Willie's venture, but also to provide legal assistance with the financial problems of the Big Bear Restaurant. *See supra* n. 2. This court believes that the bankruptcy court had some basis in fact for its statements.

Certainly, S & P's bald assertion that "[t]he Big Bear Restaurant was profitable," Plaintiff–Appellant's Brief at 26, does not suffice to show that the bankruptcy court completely misunderstood S & P's financial problems.

Next, S & P argues that the bankruptcy court, in discussing the possibility that S & P might have needed to purchase new restaurant equipment at some point during reorganization, is engaging in "pure speculation." Plaintiff–Appellant's Brief at 27. To the contrary, courts have consistently found that the availability of prospective credit, the adequacy of funds for equipment replacement, and provisions for adequate working capital are factors to be examined in determining the feasibility of a reorganization plan. *See, e.g., In re Resorts Int'l, Inc.,* 145 B.R. 412, 479 (Bankr.D.N.J.1990); *In re Elsinore Shore Assocs.,* 91 B.R. 238, 275 (Bankr.D.N.J.1988); *In re Jartran, Inc.,* 44 B.R. 331, 393 (Bankr.N.D.Ill.1984). In the future, counsel should familiarize themselves with case law as clear in meaning as the foregoing before resorting to the sort of unprofessional comments found in S & P's brief. *See* Plaintiff–Appellant's Brief at 27.

In determining whether a reorganization plan is feasible, courts routinely examine several other pertinent factors: (1) the adequacy of the capital structure; (2) the business's earning power; (3) economic conditions; (4) management's ability; (5) the probability of the present management's continuation; and (6) any other factors related to the successful performance of the plan. *In re U.S. Truck Co., Inc,* 800 F.2d 581, 589 (6th Cir.1986); *In re Clarkson,* 767 F.2d 417, 420 (8th Cir.1985); *In re Briscoe Enters., Ltd.,* 138 B.R. 795, 805 (N.D.Tex.1992); *In re Polytherm Indus., Inc.,* 33 B.R. 823, 831 (W.D.Wis.1983); *In re Immenhausen Corp.,* 172 B.R. 343, 348 (Bankr.M.D.Fla.1994). These factors do not constitute a mandatory checklist, but rather a list of potential areas that may offer a court guidance in ascertaining feasibility. While the record in the instant case offers no evidence that the bankruptcy court examined management's ability or the probability of the present management's continuation (both of which appear to be largely irrelevant here), there is every

indication that the court examined the other enumerated factors in some detail.

In light of the above factors, it can hardly be stated, much less found, that confirmation of S & P's theoretical plan would "not likely [have been] followed by the liquidation, or need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11) (1993). The bankruptcy court's elaborate discussion of its reasons for finding that reorganization would have been impossible clearly rises to more than "[t]he mere potential for failure of the plan," *In re Bergman*, 585 F.2d 1171, 1179 (2d Cir.1978), or "[t]he prospect of financial uncertainty." *In re Patrician St. Joseph Partners*, 169 B.R. 669, 674 (D.Ariz. 1994). Rather, the bankruptcy court's order discloses a thorough examination of "the totality of the circumstances," *In re Mulberry Phosphates, Inc.*, 149 B.R. 702, 708 (Bankr. M.D.Fla.1993), and an absence of "concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the [theoretical] plan." *In re SM 104 Ltd.*, 160 B.R. 202, 235 (Bankr.S.D.Fla.1993) (alteration added). Therefore, this court finds that the plaintiff-appellant has failed to show the bankruptcy court's decision that reorganization would have been impossible was clearly erroneous.

### D. S & P's Damages

Having found that the bankruptcy court did not clearly err in finding that reorganization would have been impossible, this court must now address the issue of the plaintiff-appellant's damages. As noted above, the bankruptcy court found in its original order that the true measure of S & P's damages was the value of the Big Bear Restaurant as an ongoing reorganized business. *See* Bankr.Ord. (Oct. 21, 1992) at 17. Because S & P has failed to show that there was a possibility of reorganization under § 1129, the Big Bear thus had no value as an ongoing business for purposes of calculating S & P's loss. Therefore, this court finds that the damages enumerated in the bankruptcy court's order on remand—for Pfeifer's retainer, inventory given away during eviction, and worthless menus—are correct and proper. *See* Bankr.Ord. (Feb. 24, 1995) at 25–28.

### *CONCLUSION*

This court has carefully reviewed the plaintiff-appellant's other allegations of error and find them either to have been dealt with by the foregoing discussion of the issues or to be without merit. For the reasons detailed above, the order entered by the bankruptcy court on February 24, 1995, is **AFFIRMED**. This appeal is hereby **DISMISSED. IT IS SO ORDERED.**